UNITED STATES, Appellee

v.

Jay L. BREWER, Major, U.S. Air Force, Appellant.

No. 94–0020.
CMR No. 29457.

U.S. Court of Appeals for the Armed Forces.

Argued March 8, 1995.

Decided Sept. 27, 1995.

For Appellant: *Lieutenant Colonel Joseph L. Heimann* (argued); *Colonel Jay L. Cohen* (on brief); *Major George F. May.*

For Appellee: *Colonel Thomas E. Schlegel* (argued); *Captain Jane L. Harless* (on brief); *Colonel Jeffery T. Infelise.*

*Opinion of the Court*

WISS, Judge:

1. After a contested trial, general court-martial members convicted appellant of making a false official statement and of conduct unbecoming an officer concerning his personal relationship with a female enlisted person, in violation of Articles 107 and 133, Uniform Code of Military Justice, 10 USC §§ 907 and 933, respectively. Thereafter, the members sentenced appellant to a dismissal from the service and a fine of $1,000. The general court-martial convening authority approved these results; and, with minor modifications of the false-statement specification, the Court of Military Review[1] affirmed.

2. On appellant's petition, we granted review of the following issue as modified by this Court:

> WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ALLOWING TRIAL COUNSEL TO CROSS-EXAMINE DEFENSE CHARACTER WITNESSES ABOUT MATTERS WHICH OCCURRED OUTSIDE THE TIME FRAME WHERE THEY COULD VOUCH FOR APPELLANT'S GOOD MILITARY CHARACTER.

Now, on the reasoning that follows, we hold that the military judge did not abuse her discretion in making the complained-of ruling.

## I

3. The charges of which appellant was convicted arose from his sexual relationship with a female airman and the steps that he allegedly took to cover it up. Appellant did not contest that he had such a relationship— one apparently that began in late November or early December 1990, turned sexual in character in mid-January 1991, and ended on January 22, 1991, when an anonymous "hotline" caller complained of appellant's "dating an enlisted member" of another squadron. Rather, the trial was a credibility battle between appellant and prosecution witnesses regarding whether he had lied about it earli-

er, whether he had impeded an investigation into his conduct (the subject of two specifications of obstructing justice of which appellant was acquitted), and whether he had told a subordinate in his unit about his relationship and about his steps to keep it secret.

4. The defense tactic was to pit appellant's denial of having lied and deceived against the prosecution's evidence to the contrary. To this end, the defense called three witnesses who testified glowingly about appellant's exceptional professional performance and character: Colonel Warner, who knew appellant from 1982 through 1984; Colonel Malik, who knew him from 1985 through 1987; and Lieutenant Colonel Carrier, who knew appellant from 1987 through 1988. The eye of the tempest in this appeal is the last witness.

5. Lt.Col. Carrier was a 19-year veteran who had been appellant's immediate supervisor for one year in Korea. He testified on direct examination that he had had daily contact with appellant during that time. Then, defense counsel and Carrier had the following exchange:

Q. And how did he perform his duties during that period?
A. He did a superb job.
Q. Weren't there any problems at all noted in his duty performance?
A. None whatsoever.

\* \* \*

Q. During the contact—during the time that you knew him, did you form an opinion as to his character for telling the truth?
A. I felt he was extremely honest and of high moral character.

After establishing that Carrier had "read the charges" against appellant and so was aware of the charged misconduct, defense counsel turned the witness over to the prosecution for cross-examination.

6. In response to trial counsel's questions, Lt.Col. Carrier indicated that he "had not had any contact with" appellant since their duty together ended in 1988—he was unaware that appellant was a squadron com-

---

1. *See* 41 MJ 213, 229 n. \* (1994).

mander and that his wife had divorced him. Carrier acknowledged that it had been "quite a shock for [him] to read the charge sheet" the previous day. At this point, the following exchange occurred that reflects a prosecution effort to test the quality and accuracy of Lt.Col. Carrier's favorable character testimony and the defense's attempt to block that effort:

Q. And your opinion concerns his officership and truthfulness and good military character, is that right?

A. That's right.

Q. Were you aware, or did you know that Major Brewer was faced with similar problems when Colonel Peterson was the wing commander—

DC: I am going to object, Your Honor, this *goes clearly beyond anything brought out in direct examination.*

TC: That's the basis for the opinion, Your Honor, *they opened the door to good military character.*

DC: *We opened the door for the period in which this witness knew him.* This witness has already—

MJ: Well, Captain Bartlemay, if we are going to limit his testimony to that period, *it's not relevant, unless you are trying to connect it to him today.*

DC: Your Honor, the witness has further already testified he hadn't had any contact with the accused during the time frame that the trial counsel is going into.

MJ: I will overrule the objection.

TC: Did you know that Major Brewer was faced with a similar situation last summer when Colonel Peterson was the wing commander?

WIT: No. I stated that I have had no contact with Major Brewer since I left Korea in 1988.

Q. Are you aware of the difficulties that he had concerning excessive socializing with enlisted members and a subordinate officer since removal from his squadron last summer, were you aware of that?

A. No.

Q. If you knew that that went on, would that change *your opinion about his good military character?*

A. I would have to know that that's a fact.

Q. And did you know—if you knew that he was in fact socializing with an enlisted woman, not in his squadron, that they worked out together regularly at the gym; that he met her for meals on base and off base; that he met her at parties where other enlisted members were present; that they hugged and kissed at these parties; that they had sexual intercourse at his house on several occasions; that he met her or encountered her at a bar one night; that they had sexual intercourse in his truck in a residential area; if you knew that, would that affect your opinion about his good military character?

DC: I'm going to object again, Your Honor. *I only asked him concerning his duty performance during 1987 and 1988. I did not ask any general officership questions of this witness.*

TC: His duty performance is only relevant to the issue of good military character and they have opened the door by that line of questioning.

MJ: Well, *it is true that the direct was limited to duty performance and for truthfulness.*

TC: *The duty performance is not relevant to any charges before this court, except that it bears upon his good military character and officership, and by attempting to prove good military character and officership they have opened the door through questioning this witness about the basis of his opinion about Major Brewer's character.*

MJ: I will overrule the objection.

TC: Please answer the question.

WIT: Okay, I'll tell you, the truth, it probably wouldn't affect my opinion too much.

Q. So, even if you knew all that, you'd still have the same opinion about his officership?

A. For the time frame that he worked for me.

Q. That really doesn't answer the question. Do you have an overall opinion of him or do you have an opinion or do you

have an opinion that is separated into time frame?

A. Well, I have ... my opinion is based on the time period that I knew Jay Brewer.

Q. Okay. If you base your opinion on the time frame that you knew Jay Brewer and the additional matters that I have presented to you, then what would your opinion be?

A. It wouldn't change much. I still think he is a fine man.

(Emphasis added.)

## II

7. As is apparent from the granted issue and from the quoted colloquy at trial, this appeal concerns the proper scope of cross-examination that is fashioned to test the soundness of opinion testimony implying that the accused's character is such that he is not the sort of person who would do the act with which he is charged. One common approach is to probe into the information base upon which a witness relies for his or her opinion through questions beginning with, "Do you know ..." or, "Are you aware that...." *See Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). To the extent that the cross-examiner can show that the witness is unaware of certain salient facts or events that logically bear upon the character trait in issue, the weight of the witness' opinion obviously is diminished. Particularly this case causes us to focus: first, on admissibility of the witness' direct testimony; and, second, given its admissibility in substance and form, on the appropriate range of the cross-examination designed to test the opinion testimony.

8. Mil.R.Evid. 404(a), Manual for Courts-Martial, United States, 1984, generally admonishes that "[e]vidence of a person's character or a trait of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith...." Such evidence generally is inadmissible because it has "little probative value in determining the accused's guilt" and "has the potential for reflecting court-members' attention away from the operative facts and

... burying them 'in a myriad of distracting and irrelevant [side-] issues of the accused's past life.'" S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* [hereafter Saltzburg] 458 (3d ed. 1991), quoting *United States v. Weeks,* 17 MJ 613, 616 (NMCMR 1983).

9. One of the three specific exceptions to this rule of exclusion, however, is found in subsection (1), which permits "[e]vidence of a pertinent trait of the character of the accused [to be] offered by an accused...." Thus, an accused may offer evidence of a "relevant trait or traits that the judge believes relate to the charged conduct," Saltzburg, *supra* at 458, in order to imply that the accused acted in conformance with that trait on the particular occasion in question. *See generally* Mil.R.Evid. 401 (defines "relevant evidence") and 402 (relevant evidence admissible; evidence not relevant not admissible). Such evidence may be offered "by testimony as to reputation or by testimony in the form of an opinion." Mil. R.Evid. 405.

10. On direct examination, defense counsel asked Lt.Col. Carrier about the quality of appellant's duty performance, whether there had been "any problems at all" in that performance, and whether Carrier had formed an opinion as to appellant's character for telling the truth. In response, the witness provided not only the answers to these questions ("superb," "none whatsoever," and "honest," respectively) but also opined that appellant was "of high moral character." Although defense counsel never articulated his theory or theories of relevance, the questions and testimony suggest these two:

11. First, appellant was a top-notch officer in 1987–1988, remained a top-notch officer thereafter, and top-notch officers do not lie and deceive. *Cf. United States v. Benedict,* 27 MJ 253, 262 (CMA 1988)(error to exclude "evidence of the specific character trait of 'good conduct as an officer'" in prosecution for sexual molestation); *United States v. Belz,* 20 MJ 33 (CMA 1985)(evidence of good military character admissible under Mil.R.Evid. 404(a) in drug prosecutions under Articles 92, 112a, 133, and 134,

UCMJ, 10 USC §§ 892, 912a, 933, and 934). Second, appellant is truthful and moral, and truthful and moral people do not lie and deceive. *Cf. United States v. Pearce*, 27 MJ 121 (CMA 1988)(character trait of "honesty" admissible in larceny prosecution).

12. On cross-examination, trial counsel sought to challenge the bases of Lt.Col. Carrier's opinions. Mil.R.Evid. 404(a) permits "the prosecution to rebut" an accused's evidence of a pertinent character trait, and Mil. R.Evid. 405(a) specifically authorizes cross-examination "inquiry . . . into relevant specific instances of conduct" in order to do so.

13. Defense counsel objected to the prosecution's efforts here, however, apparently on grounds of relevance in comparison to the scope of the direct examination. The first objection, which expressly is within the four corners of the granted issue, questioned whether specific instances of conduct were relevant that were not within the time period upon which Carrier based his opinion. Although appellant correctly points out that such cross-examination is limited under Mil. R.Evid. 405(a) to *relevant* instances of conduct, his artificial limitation of relevance to the same time period as that which formed the basis of the opinion sometimes would be illogical.

14. This is such a case. The military judge had it right when she noted for defense counsel that the witness' opinion itself was "not relevant, unless you are trying to connect it to him today." *See* Saltzburg, *supra* at 496 ("Often overlooked under the Rule is the fact that the character with which the Rule is concerned is character at the time of the crime charged."). That being so, instances of conduct in between the period that was the basis of the opinion and the time of the offense equally are relevant on the question whether, as the direct testimony would imply, appellant had the same character traits when the charged crime occurred as when the witness knew him. *See United States v. Morgan*, 554 F.2d 31 (2d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977).

15. In *United States v. Pearce*, 27 MJ at 124, this Court rebuffed a similar appellate

complaint "that the cross-examination was impermissible because it concerned events which occurred at a time when the witness had no contact with appellant." The Court noted that "the implication . . . [of the direct testimony was] that appellant was an honest person several years ago; he is an honest person now; therefore, he was probably an honest person in between." In that context, specific instances of conduct that occurred "in between" were relevant for purposes of Mil.R.Evid. 405(a). Equally so here.

16. The later objection of defense counsel, which apparently is not within the granted issue, questioned the relevance of the instances of misconduct as not within the substantive scope of the direct examination. Defense counsel argued that he had limited his questioning to duty performance and "did not ask any general officership questions of this witness." Appellate counsel makes the same argument in his brief before us. Accordingly, while not within the granted issue, we will pause briefly to address it.

17. To be accurate, defense counsel asked the witness about the quality of appellant's duty performance and his truthfulness. The witness responded to these questions and, as well, offered that appellant was of high moral character. As trial counsel appropriately argued in response to this latter defense objection, "duty performance is not relevant to any charges before this court, except that it bears upon his good military character and officership, and by attempting to prove good military character and officership, they have opened the door through questioning this witness about the basis of his opinion about Major Brewer's character."

18. In other words, given the charges being tried, the only relevance of appellant's duty performance is the extent to which that translates into good military character, both generally and as an officer. Thus focused, it is relevant on cross-examination to ask the witness his awareness of any specific instances of conduct that logically would bear upon that character trait.[2]

2. A word of admonition, however: The supposedly-hypothetical question asked by trial counsel

that in fact incorporated the circumstances underlying the charge being tried is objectionable.

### III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

CRAWFORD, Judge (concurring in the result):

19. I agree with the holding that defense counsel opened the door for the prosecution to ask whether the character witness "knew that [appellant] was in fact socializing with an enlisted woman, not in his squadron [and] that they worked out together regularly at the gym," and so forth.

20. However, I write separately in an attempt to clarify the following numerous issues concerning character evidence: (1) the difference between logical and legal relevance of character evidence; (2) the scope of character evidence; (3) the method of proving character; (4) the form of questioning; and (5) the issue of opening the door and the proper scope of cross-examination. I would emphasize the holding that the prosecution rebuttal was permissible.

21. Taken substantially without change from Fed.R.Evid. 404(a), Drafters' Analysis, Manual for Courts–Martial, United States, 1984, at A22–32 (Change 2), Mil.R.Evid. 404(a) provides:

> *Character evidence generally.* Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:
>
> (1) *Character of the accused.* Evidence of a pertinent trait of the character of the accused offered by an accused, or by the prosecution to rebut the same[.]

#### (1) Logical and Legal Relevance

22. The defendant's character is certainly logically relevant in determining whether an individual committed a crime. I do not think anyone would doubt that if the defendant was charged with larceny and was known in the community as a thief, that would be logically relevant in determining whether the individual committed the offense. However, while logically relevant, it is not legally relevant. In a sense it is *too* probative. *See generally* Falknor, *Extrinsic Policies Affecting Admissibility,* 10 Rutgers L.Rev. 574, 584 (1956). As Dean Wigmore indicated, "This policy of the Anglo–American law is more or less due to the inborn sporting instinct of the Anglo–Normandom—the instinct of giving the game fair play even at the expense of efficiency of procedure." 1A Wigmore, *Evidence* § 57 at 1185 (Tillers rev. 1983). Thus, as Mil.R.Evid. 404(a)(1) indicates, unless the defendant introduces evidence of a "pertinent" character trait, the Government may not in the first instance introduce character evidence. "Not that the law invests the defendant with a presumption of good character, but it simply closes the whole manner of character, disposition and reputation on the prosecution's case-in-chief." *Michelson v. United States,* 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948) (citation omitted).

#### (2) Scope of Character Evidence

23. In dicta the majority implies that the evidence introduced in this case is proper under Mil.R.Evid. 404(a)(1). This is not the case.

24. Mil.R.Evid. 404(a)(1) permits "[e]vidence of a pertinent trait of the character of the accused." It "is a significant change from ¶ 138*f* of the 1969 Manual [for Courts–Martial, United States, 1969 (Revised edition)] which also allows evidence of 'general good character' of the accused to be received in order to demonstrate that the accused is

---

*United States v. Mason,* 993 F.2d 406, 409 (4th Cir.1993). It is not permissible, in order to test the basis of a witness' character opinion, in effect to ask the witness whether the charge then before the court-martial would affect the witness' opinion. *See United States v. Senak,* 527 F.2d 129 (7th Cir.1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758 (1976); S. Saltzburg,

L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 496 (3d ed. 1991). Defense counsel did not object on this ground, however, *see* Mil.R.Evid. 103(a)(1), Manual for Courts–Martial, United States, 1984, so appellate complaint was waived in the absence of plain error, *see* Mil.R.Evid. 103(d), which we do not find here.

less likely to have committed a criminal act." Mil.R.Evid. 404(a)(1), Drafters' Analysis, 1984 Manual, *supra* at A22–32 (Change 2). The majority's opinion references with approval our prior case law concerning the scope of character evidence. ¶ 11.

25. "Pertinent" did not appear in the Preliminary Draft of Fed.R.Evid. 404(a)(1). 46 F.R.D. 161, 227 (1969). However, based on an objection from Professor Peterfreund, "pertinent" was added to prevent admission of *"general* good character without reference to a *relevant* trait." Wright & Graham, *Federal Practice and Procedure: Evidence* § 5236 at 384 and n. 25 (1978).

26. The Federal courts are split on whether general good character and law-abidingness evidence is admissible even if unrelated to the specific crime charged. In *United States v. Santana–Camacho,* 931 F.2d 966, 967–68 (1st Cir.1991), the court held that evidence of character as "a good family man" and as "a kind person" was inadmissible because it was not pertinent to the illegal transportation of aliens into the country. Likewise, in *United States v. Nazzaro,* 889 F.2d 1158, 1168 (1st Cir.1989), the court held that character for "bravery" and "attention to duty" was not pertinent to the charges of mail-fraud conspiracy and perjury. *See also United States v. Hill,* 40 F.3d 164, 169 (7th Cir.1994) ("law-abidingness" not a "pertinent character trait" related to charges of dealing in cash and checks); *State v. Squire,* 321 N.C. 541, 364 S.E.2d 354, 357 (1988)("an accused may no longer offer evidence of undifferentiated 'good character' ... he must tailor the evidence to a particular trait that is relevant to an issue in the case"); *State v. Bragg,* 516 A.2d 556 (Me. 1986); and *Mowbray v. State,* 788 S.W.2d 658, 668 (Tex.App.1990). Nevertheless, a number of other courts have permitted evidence of law-abidingness. *See, e.g., United States v. Angelini,* 678 F.2d 380 (1st Cir. 1982); *United States v. Hewitt,* 634 F.2d 277, 280 (5th Cir.1981) (recognizing the history behind the rule and that it might be read otherwise).

27. Rather than being based on Mil. R.Evid. 404(a)(1) and the Analysis, the cases cited by the majority find their genesis in an interpretation of a selected few decisions of federal courts of appeals. *See, e.g., United States v. Clemons,* 16 MJ 44, 47 (CMA 1983), relying on *Angelini* and *Hewitt.* Mil.R.Evid. 404(a)(1), however, is a rule designed for a worldwide system of justice. For example, one must keep in mind that the scope of character evidence dictates a defendant's right to compulsory process 6,000 miles from the situs of the trial whether there is a military crisis.

28. It must be remembered that admission of character evidence is a question of logical and legal relevance. Certainly logical relevance diminishes when one is admitting general character evidence versus evidence that is relevant to a specific trait. *State v. Scalf,* 254 Iowa 983, 119 N.W.2d 868 (1963).

29. Even under the most expansive reading of Mil.R.Evid. 404(a)(1), not all the testimony submitted by the defense should have been admitted into evidence. Appellant was charged with conduct unbecoming an officer and making a false statement. To counteract those charges the defense introduced the following evidence: appellant performed his duties in a superb manner; there was no problem concerning his duty performance; he was extremely honest; he was of high moral character; and he was "a fine man."

(3) Method of Proving Character Evidence

30. In addition to expanding the scope of character evidence the majority does not distinguish between reputation and opinion-type evidence. Mil.R.Evid. 405(a) provides that the proponent may introduce "reputation" or "opinion"-type evidence in proving character. Opinion evidence is testimony based on the witness' "own acquaintance, observation, and knowledge." Based on this he or she can give an "independent opinion" of good character. *Michelson v. United States,* 335 U.S. at 477, 69 S.Ct. at 219. As *Michelson* asserts, this was not permissible prior to the Federal Rules of Evidence. Reputation-type evidence "summarizes what" the witness "has heard in the community." *Id.* Thus reputation-type evidence describes "the shadow his daily life ... cast in his neighborhood." *Id.*

### (4) Form of the question

31. While not making a substantive difference in this case, the form of the question depends on the type of evidence introduced. Prior to the Federal Rules of Evidence, it was permissible only to introduce reputation versus opinion type character evidence. In *Michelson*, Justice Jackson stated:

> The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possesses a good general or specific character, inconsistent with commission of acts charged. The witness is, however, allowed to summarize what he has heard in the community....

335 U.S. at 477, 69 S.Ct. at 219. As a result, it was impermissible to ask the questions, "Do you know?" versus "Have you heard?" 335 U.S. at 482, 69 S.Ct. at 221 (" 'Do you know?' is not allowed."). The "Do you know?" question would refer to someone who was expressing an opinion based on personal knowledge. The "Have you heard?" is concerned with how the defendant is known in the community. However, since both reputation and opinion type evidence are admissible under Mil.R.Evid. 405(a), the form of the question may be immaterial, although the distinction between the two types of evidence remains. Thus, it would be better if the form of the question was addressed to the type of character evidence being used. For reputation evidence, the appropriate question would ask whether the witness has *heard* about these events, not whether the witness *knows* about them. The distinction may be important to lawyers and jurors. *See Coleman v. United States*, 420 F.2d 616, 621–23 (D.C.Cir.1969).

### (5) Opening the Door—Proper Scope of Cross–Examination

32. The holding in this case is the reasonable inference that if the defendant was known as an honest person between 1987 and 1988, he could still be considered such in 1991. The defense introduced evidence from LTC Carrier who knew the defendant between 1987 and 1988. The prosecution then sought to impeach him by asking him about acts by the defendant in 1991. The defense objected by indicating that this time frame was not within the scope of the direct examination. The judge recognized the issue by saying that good character evidence between 1987 and 1988 would not be "relevant, unless you are trying to connect it to him today." The reasonable inference the defense wanted the court to infer was that appellant's good character evidence was relevant to the offense charged.

33. But this court has indicated that the cross-examiner is not going to be limited to the period of time chosen by the proponent. Rather, he or she will be able to impeach the witness concerning any reasonable inferences to be drawn from that period. *United States v. Kindler*, 14 USCMA 394, 399–400, 34 CMR 174, 179–80 (1964). The court in *Shields* stated that "the defense must assume responsibility not only for the specific evidence it introduces but also for the reasonable inferences which may be drawn from such evidence." *United States v. Shields*, 20 MJ 174, 176 (CMA 1985). Mil.R.Evid. 404(a)(1) permits the prosecution to "rebut" the defense evidence. This is a classic case of opening the door. *See United States v. Banks*, 36 MJ 150 (CMA 1992). Even an inadvertent or surreptitious opening of the door may permit rebuttal. *United States v. West*, 58 F.3d 133 (5th Cir.1995); *State v. Heath*, 58 Wash.App. 320, 792 P.2d 558, 563 (1990).

34. As the Court in *Michelson* stated: "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." 335 U.S. at 479, 69 S.Ct. at 220. The impeachment may involve asking questions about a prior conviction, *id.* at 482, 69 S.Ct. at 221–22; a "false arrest," *id.* at 482, 69 S.Ct. at 221–22; or a "rumor," *id.* at 478–79, 69 S.Ct. at 219–20. If the individual knew of the conviction, "arrest," or "damaging rumors," *id.* at 479, 69 S.Ct. at 220, it

would show that the witness' standards as to what constitutes good character might be different from that of the court members. *See, e.g., United States v. Baldwin,* 17 USCMA 72, 77, 37 CMR 336, 341 (1967) (character witnesses may be crossed-examined as to "rumors or reports of particular acts imputed to the accused. . . ."). *See also United States v. Donnelly,* 13 MJ 79 (CMA 1982) (proper to cross-examine character witnesses about uncharged misconduct, even though was same as offense charged); *United States v. Statham,* 9 USCMA 200, 203, 25 CMR 462, 465 (1958) (defense character witness testified that he had known the accused in the service for almost 3 years; proper for court member to ask if the accused had "always been a private" or had there been a reduction for misconduct). If the witness did not know of the conviction, arrest, or rumor, it is questionable whether he or she was familiar enough with the defendant's reputation in the community to testify. At least one would question the witness' knowledge of the community.

35. In summary, it is important that the bench and bar make the distinction between logically and legally relevant evidence, the scope of character evidence, the method of proving character, and the forms of the question used to impeach character witnesses.