*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
DALY, HARRELL, and KORN
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Jason L. GRABAU**
Air Traffic Controller Senior Chief Petty Officer (E-8), U.S.
Navy
*Appellant*

**No. 202400152**

_____

Decided: 26 November 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Kimberly J. Kelly

Sentence adjudged 12 January 2024 by a special court-martial tried at
Naval Air Station Pensacola, Florida, consisting of officer and enlisted
members. Sentence in the Entry of Judgment: reduction to E-6.

For Appellant:
*Lieutenant Benjamin M. Cook, JAGC, USN*

For Appellee:
*Lieutenant Colonel Candace G. White, USMC*
*Lieutenant Lan T. Nguyen, JAGC, USN*

Senior Judge HARRELL delivered the opinion of the Court, in which Chief Judge DALY and Judge KORN joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

HARRELL, Senior Judge:

Court-martial members convicted Appellant, contrary to his pleas, of one specification of failure to obey a lawful order in violation of Article 92, Uniform Code of Military Justice (UCMJ).[1] Appellant asserts five assignments of error (AOE), four of which warrant discussion:

    I.  Is Appellant's sentence to a reduction in pay grade from E-8 to E-6 inappropriately severe?

    II.  Did the military judge err by allowing the Government to cross-examine a presentencing character witness on allegations that Appellant failed to pay child support?

    III.  Is the Defense's failure to request an applicable instruction forfeiture, and if so, was the military judge's failure to provide the instruction on "have you heard" questions to impeach opinion testimony plain error?

    IV.  If this Court finds waiver, was trial defense counsel ineffective for failing to request the instruction for "have you heard" questions to impeach opinion testimony?[2]

_____

[1] 10 U.S.C. § 892. The members acquitted Appellant of the greater offense of domestic violence by violating a protective order with the intent to threaten and intimidate his spouse in violation of Article 128b. The members also acquitted Appellant of one specification of stalking in violation of Article 130, and the military judge entered a finding of not guilty pursuant to Rule for Courts-Martial (R.C.M.) 917 to one specification of violating a no contact order in violation of Article 92.

[2] A fifth AOE—Was trial counsel's insinuation that Appellant's character witness exaggerated Appellant's service in Iraq and his implication that Appellant falsely held

We answer all in the negative, find no prejudicial error, and affirm the findings and sentence.

# I. BACKGROUND

As Appellant's marriage crumbled, his erratic and threatening behavior caused concern to his wife, Ms. Whiskey.[3] After twice calling the police to their home, Ms. Whiskey moved across the country with their children to live with her mother. Appellant's commanding officer issued a military protective order, prohibiting Appellant from "initiating any contact or communication" with Ms. Whiskey.[4] Appellant did not comply. He contacted her via email and text message with lengthy expositions of his feelings and many grievances with her. Within them he wrote, "The Military can f[***] off they do not have authority over me, I've only stayed away in order to not cause you pain,"[5] and "You can keep running, I will always catch you. Can't run forever."[6]

And he sent her a penis-shaped chocolate with "EAT A D[***]" inscribed on the box.[7] Keeping up the priapic theme, he also mailed her "a pack of penis-shaped gummies and a glitter bomb with penis-shaped confetti in it and glitter."[8]

Among other offenses, the Government charged Appellant with one specification of domestic violence by violating a protection order by wrongfully communicating with his wife with the intent to threaten and intimidate her. The court-martial members acquitted him of that offense but convicted him of the lesser included offense of violating a lawful order. All the issues now raised by Appellant stem from the sentencing phase that followed.

---

himself out as having a combat action ribbon improper sentencing argument?—warrants no discussion or relief. Same for a related part of AOE II: Did the military judge err by allowing the Government to cross-examine a presentencing character witness to insinuate that this character witness overstated Appellant's service in Iraq? We have thoroughly considered these issues and find them to be without merit. *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

[3] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[4] Pros. Ex. 2 at 2.

[5] Pros. Ex. 10 at 2.

[6] Pros. Ex. 11 at 1.

[7] Pros. Ex. 7.

[8] R. at 401.

The Government rested without presenting any evidence beyond that admitted during the findings phase of the court-martial. Ms. Whiskey provided an unsworn victim impact statement in which she blamed Appellant's poorly treated post-traumatic stress disorder for his misconduct, and she asked that Appellant not be reduced in grade, made to forfeit pay, or confined. She added, "I realize that this sounds conflicting from someone who's just testified about the level of fear and trauma that he created in my life and those of my children, but he will remain a significant figure in my life and he will be the father of my children for the entirety of our existence."[9] Indeed, she earlier testified that Appellant's communications "perpetuated the fear I had been feeling for months,"[10] "continued to concern me for my safety,"[11] and that she felt threatened[12] and intimidated.[13]

The Defense called a series of witnesses, including Chief Tango, a mentee and former subordinate of Appellant. Chief Tango testified about Appellant's commendable performance during a deployment and then about the nature of their frequent conversations:

> Q: What are those conversations about?
>
> A: Well, I like to, you know, check in with him and see how he's doing. I'm aware of how, you know, his life has been. We talk about things at work, whatever professional things I'm going through in the Navy. He's still like a Naval mentor to me, someone I can ask questions or get an opinion from. So we talk about life. We talk about, you know, what's going on in his life, what's going on in my life.
>
> Q: Do you--do you talk about your kids?
>
> A: Yes, certainly.
>
> Q: What are those conversations like between you two?
>
> A: You know, I--that the experiences I've had . . . in becoming a father and all the things we learn as a young parent, we share those idea [sic] on what that ideally looks

---

[9] R. at 625–26.

[10] R. at 269.

[11] R. at 478.

[12] R. at 268.

[13] R. at 268, 478.

like and--for us or what we want to achieve or what we want--how we want to raise our families and how our actions . . . will impact them or leave some sort of impression on our kids, maybe something that they carry later--right--in their life. And so we have those conversation about like a cause and effect, you know, how your demeanor is . . . . So we just discuss all these types of things.

Q: And so when you're talking to Senior Chief Grabau, do you ever talk to him while you're driving home?

A: Oh, yeah . . . . I think that mostly in my drive home--we have a--kind of a cue there when he knows that I park my car. He says, "All right, I'm getting off—I'm hanging up now. You need to go be with your family." And that's kind of the tone we talked about, the mentorship and experiences that I've had with him . . . . It's family first for us as--in the community but even more, I think, as two individuals who are trying to be the best fathers we can be for our families.[14]

Right off the bat in cross-examination, trial counsel asked:

Q: Chief, you just testified about Senior Chief Grabau's love of his children, taking care of his children. Is that correct?

A: Yes, sir.

Q: Are you aware that Senior Chief Grabau transferred his bank account away from his wife so she could not access it?[15]

The military judge sustained a Defense objection to that question on the basis that "[t]he testimony was about Senior Chief Grabau as a father. What the question is about is about a financial dispute between Senior Chief Grabau and Ms. [Whiskey]."[16] Pressing on, trial counsel took a different tack and asked, "Chief, are you aware that Senior Chief Grabau, throughout this time period that you described--you testified he was at the mercy of this whole thing

---

[14] R. at 657–58.

[15] R. at 661.

[16] R. at 661.

and loved his children, that he was not paying child support?[17] Defense counsel again objected on the same basis. After some back-and-forth during an Article 39(a) session, defense counsel conceded that trial counsel had a good faith basis for the question[18] but lodged "a broad [Military Rule of Evidence] 403-type objection that what . . . Chief [Tango] testified to was that they had conversations about what it meant to be a dad."[19] The military judge responded:

> Right, and that they both wanted to be good fathers. So you elicited that testimony. So, . . . I assume you assessed this possibility when you elicited that testimony. And so what the Government is trying to do is essentially rebut the testimony that you elicited . . . . I will allow the question, but I want you to move on quickly, [trial counsel]."[20]

With the members back, trial counsel continued:

> Q: Chief, so you testified on direct about Senior Chief Grabau taking care of his children, love for his children, that sort of thing. Are you aware that Senior Chief Grabau was not paying child support while the protective order was in place?
>
> A: I am not.[21]

Trial counsel then moved on to other matters, and nothing more was mentioned of this child support issue before the members during the remainder of the proceeding.[22] In an unsworn statement, Appellant described his mental health struggles following deployment and the impact of being separated from his children.

Before instructing the members on sentencing, the military judge provided the parties with copies of the prepared instructions and asked if there were

---

[17] R. at 661–62.

[18] Appellant was arraigned on one specification of dishonorably failing to pay debt—four months of child support payments owed to Ms. Whiskey—in violation of Article 134, UCMJ, but the convening authority withdrew and dismissed it before trial.

[19] R. at 666.

[20] R. at 666.

[21] R. at 668.

[22] The military judge sustained a Defense objection to the anticipated testimony of a witness who the Government sought to testify in its case in rebuttal "about how [Appellant] was not paying child support . . . ." R. at 685.

any requests for additional instructions. Both sides said no.[23] The military judge then instructed the members, making no mention of trial counsel's question to Chief Tango regarding child support. The military judge then asked:

> MJ: Do counsel object to the instructions as given or request any other instruction?
>
> TC: Government does not.
>
> DC: No objection, Your Honor.[24]

For good measure, when the members departed, trial counsel sought clarity:

> TC: [J]ust to protect the record, the military judge asked defense if they have any objections or request additional instructions in sentencing. The defense stated they have no objections. They didn't answer the question about requesting additional instructions, Your Honor. So the government just asks that there be clarification on that.
>
> MJ: Okay. [Defense counsel], do you request additional instructions?
>
> DC: I do not, Your Honor.[25]

In argument, trial counsel asked the members to, "at the very least, reduce him two grades. The very least, because Senior Chief Grabau has no business being in the chiefs mess when he can't follow a military protective order. Beyond that, the government is leaving it to you to decide."[26] Defense counsel asked for no punishment. The members sentenced Appellant to be reduced two pay grades, to E-6.

---

[23] R. at 705.

[24] R. at 730.

[25] R. at 733.

[26] R. at 715.

## II. DISCUSSION

### A. The sentence is not inappropriately severe.

We review sentence appropriateness de novo.[27] We "may affirm only the sentence, or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved."[28] In order to "assur[e] that justice is done and that the [appellant] gets the punishment he deserves,"[29] we conduct an "individualized consideration of the particular appellant on the basis of the nature and seriousness of the offense and the character of the offender."[30]

Appellant argues his two-pay-grade reduction is an inappropriately severe sentence largely by contrasting the "minor offense" of which he was convicted—deserving of no more than nonjudicial punishment, he contends—with the more serious offenses of which he was acquitted.[31] But our sentence appropriateness review is not so myopically focused on the findings. And yes, the Government offered no evidence in aggravation as Appellant points out, but evidence admitted during the findings proceeding may be considered for sentencing.[32] That evidence portrays a senior enlisted Sailor deliberately and repeatedly flouting the authority of his commanding officer in a manner that caused his wife increasing distress, having already fled from his physical presence out of concern for her safety. Appellant also points to mitigating evidence adduced at trial, which very well may account for why the members sentenced Appellant to *only* reduction to E-6 when much more was on the table. Considering it all ourselves, we conclude reduction to E-6 to be an appropriate sentence that should be approved.

---

[27] *United States v. McAlhaney*, 83 M.J. 164, 167 (C.A.A.F. 2023) (citing *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006)).

[28] Article 66, UCMJ, 10 U.S.C. § 866 (2018 & Supp. II 2021) (subsequently amended by Pub. L. No. 117-81, 135 Stat. 1541, 1703 (2021)).

[29] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

[30] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation modified).

[31] Appellant's Brief at 18, 20.

[32] Rule for Courts-Martial (R.C.M.) 1001(g)(2).

**B. The military judge did not abuse her discretion in allowing the Government to cross-examine Chief Tango regarding his knowledge of Appellant's failure to pay child support.**

Appellant argues, "Trial counsel's questions about child support were improper [Military Rule of Evidence (Mil. R. Evid.)] 405(a) inquiries because Chief Tango never testified about Appellant's pertinent character trait of being a good father. Regardless, the inquiry fails an [Mil. R. Evid.] 403 balancing test (which the Military Judge did not conduct)."[33] We disagree on both accounts.

During presentencing proceedings, the defense may present matters in mitigation, which are "introduced to lessen the punishment to be adjudged by the court-martial, or to furnish grounds for a recommendation of clemency."[34] This may include character evidence, which is generally governed by Mil. R. Evid. 405(a):

> When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the military judge may allow an inquiry into relevant specific instances of the person's conduct.

We review a military judge's decision to permit cross-examination of a character witness with specific instances of conduct for an abuse of discretion.[35]

Appellant argues that he never put his character as a father in issue, thus offering the Government no avenue for inquiring about a specific instance of conduct relevant to his character as a father. The military judge disagreed at trial, and we disagree now. Granted, defense counsel did not ask Chief Tango a direct question to the effect of, "What is your opinion of his character as a father?" But those are not magic words, the only ones imbued to elicit testable character evidence, since "[t]he defense must accept responsibility not only for the specific evidence it offers in mitigation, but also for the reasonable inferences which must be drawn from it."[36]

---

[33] Appellant's Brief at 28.

[34] R.C.M. 1001(d)(1)(B).

[35] *See United States v. Brewer*, 43 M.J. 43 (C.A.A.F. 1995); *United States v. Pearce*, 27 M.J. 121 (C.M.A. 1988).

[36] *United States v. Strong*, 17 M.J. 263, 266-67 (C.M.A. 1984). We similarly divine no magical quality to "the text-book 'have [you] heard' follow-up question, namely

The appellant in *United States v. Shields* made a similar argument at trial that "the only way he could put on character evidence as to peacefulness was by asking someone how long they had known the accused and what contact they had with him and if they had an opinion or if they knew his reputation."[37] The military judge disagreed and permitted rebuttal character evidence from the government.[38] The U.S. Court of Military Appeals (CMA) concluded this was not an abuse of discretion, noting, "Since the accused did not directly offer evidence of his character and reputation for peacefulness, the only rebuttable evidence of this trait could have come from his own descriptions of his motives and acts which could, *inferentially or otherwise*, be said to show that trait."[39]

We also draw insight from *United States v. Strong*, wherein the CMA focused on the "tenor" of the defense evidence and stated:

> There is no question that the evidence presented here by the defense could not help but convince the military judge that the accused had an outstanding military character. Consequently, it would be illogical for trial counsel, having contrary knowledge, to be forced to stand by powerless to correct this impression.[40]

Here, the Defense elicited evidence that, at the very least, created a reasonable inference that Appellant possessed the character of a good father. We can conceive no reason to elicit testimony from Chief Tango about his conversations with Appellant about their children other than to convey that, whatever Appellant's faults as a husband, he is a good father deserving of mercy from the court so that he does not suffer continued separation from his children.[41] With information in hand relevant to Appellant's character as a father,

---

whether that would change his opinion about Appellant's pertinent character trait of being a good father . . . ." Appellant's Brief at 30. Trial counsel may simply have not cared for the answer, leaving any inference up to the members as it relates the weight they should give to Chief Tango's opinion.

[37] 20 M.J. 174, 175 (C.M.A. 1985) (citation modified).

[38] *Id.*

[39] *Id.* at 176 (emphasis added).

[40] 17 M.J. at 266–67.

[41] Indeed, defense counsel argued to the members:

> Punishing Senior Chief Grabau further does absolutely nothing for the Navy. It does nothing for society. It only serves to delay Senior's path back to his children and to make Senior's road to recovery that much harder.

the Government was not powerless to challenge the basis of Chief Tango's opinion. That is, of course, if doing so met Mil. R. Evid. 403 muster.[42]

Appellant correctly points out that the military judge did not articulate a Mil. R. Evid. 403 analysis on the record, a particularly glaring omission since that was the basis of a Defense objection (though itself not well articulated). But military judges are "presumed to know the law and apply it correctly, absent clear evidence to the contrary."[43] The military judge's recognition and application of Mil. R. Evid. 403 is evident through her ruling that she "will allow the question, but I want you to move on quickly . . . ."[44] The military judge implicitly concluded that the probative value of *a single* question to Chief Tango about his knowledge of Appellant's failure to pay child support to not be substantially outweighed by any danger contemplated under Mil. R. Evid. 403. Many such dangers may have tipped the scale if more than that were permitted, which the military judge guarded against. We conclude the military judge did not abuse her discretion.[45]

## C. The Defense waived any objection to the military judge's sentencing instructions.

Appellant also correctly points out that the military judge did not provide an instruction to the members regarding how they may properly consider this

---

. . . .

> Members, while giving up is not an option for Senior Chief Grabau, the thought of the pain by not being able to be in his children's lives crosses his mind every single day. But Senior knows that he has three children that love him dearly. He knows he has to be an important constant father in their lives.

R. at 717–18.

[42] *See Pearce*, 27 M.J. at 125 (agreeing with the court below, "That [Mil. R. Evid.] 403's balancing test must be applied to 'Have you heard?' or 'Do you know?' questions appears indisputable.").

[43] *United States v. Leipart*, 85 M.J. 35, 40 (C.A.A.F. 2024) (citing *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007)).

[44] R. at 666.

[45] Even if we concluded otherwise, we would conclude that Appellant did not suffer material prejudice to a substantial right. Given that trial counsel did in fact quickly move on and did not return to the subject at any point before the members, we are convinced that this brief cross-examination of Chief Tango did not substantially influence the adjudged sentence.

"did you know" question to Chief Tango and his response.[46] Appellant then correctly acknowledges the existence of *United States v. Davis,*[47] but urges us to simply not apply it. We decline to disregard binding—and indisputably apposite—precedent of our superior court.

"Whether an appellant has waived an issue is a legal question that this Court reviews de novo."[48] "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'"[49] "While we review forfeited issues for plain error, we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal."[50]

In *Davis*, the U.S. Court of Appeals for the Armed Forces (CAAF) granted review to determine if the military judge properly instructed the members on the elements of an offense, though the court was ultimately unable to reach that issue since it was waived. Acknowledging that Rule for Courts-Martial (R.C.M.) 920(f) provided that "[f]ailure to object to an instruction or to omission of an instruction before the members close to deliberate constitutes [forfeiture],"[51] the CAAF went on:

---

[46] *See* Dep't of the Army Pam. 27-9, *Military Judges' Benchbook*, para. 7-18 (July 29, 2025) [*Benchbook*] ("During the testimony of (state the name of the witness), (he) (she) was asked whether (he) (she) (knew) (had heard) (was aware) (_____) that the accused (state the matter inquired into). That was a permissible question; however, there is no evidence that the accused (state the matter inquired into). This question was permitted to test the basis of the witness's opinion and to enable you to assess the weight you accord (his) (her) testimony. You may not consider the question for any other purpose.").

[47] 79 M.J. 329 (C.A.A.F. 2020).

[48] *Id.* at 331 (citing *United States v. Haynes*, 79 M.J. 17, 19 (C.A.A.F. 2019)).

[49] *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

[50] *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (quoting *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005)).

[51] 79 M.J. at 331 (quoting and interpreting R.C.M. 920(f) then in effect). The President amended R.C.M. 920(f) in 2018 to explicitly say what the CAAF had long interpreted it to mean: "Failure to object to an instruction or to omission of an instruction before the members close to deliberate *forfeits* the objection." *2018 Amendments to the Manual for Courts-Martial, United States*, Exec. Order No. 13,825, 83 Fed. Reg. 9889, 10005 (Mar. 1, 2018) (emphasis added). R.C.M. 1005(f), regarding instructions on sentence, was amended to say the same. *Id.* at 10022. In light of exclusive military judge

> Appellant did not just fail to object and thereby merely forfeited his claim. He affirmatively declined to object to the military judge's instructions and offered no additional instructions. By expressly and unequivocally acquiescing to the military judge's instructions, Appellant waived all objections to the instructions, including in regards to the elements of the offense. As Appellant has affirmatively waived any objection to the military judge's findings instructions, there is nothing left for us to correct on appeal.[52]

The same happened here. Defense counsel affirmatively declined to object to the military judge's sentencing instructions or request any additional instructions both before and after the military judge instructed the members. Since the omitted instruction did not relate to new or unsettled law,[53] the issue is waived, and there is nothing for us to review.[54]

Appellant asks us to "revisit [our] application of" *Davis*, however, since its "framework does not account for scenarios in which defense counsel simply overlooks an applicable instruction."[55] Not so. The CAAF considered this point in a later opinion, *United States v. Rich*, noting:

> [T]he instant facts present an even stronger case for waiver than the facts in the most recent *Davis* decision. There, the record was unclear whether the defense even contemplated requesting

---

sentencing in noncapital cases in which the accused is convicted only of offenses committed after 27 December 2023, the latter rule is now gone. *2023 Amendments to the Manual for Courts-Martial, United States*, Exec. Order No. 14,103, 88 Fed. Reg. 50535, 50724 (Aug. 2, 2023). Notably (though inapplicably), however, R.C.M. 1004(f)(4), concerning sentencing instructions in capital cases, now provides, "*After being afforded an opportunity to object*, failure to object to an instruction or to omission of an instruction before the members close to deliberate shall constitute *waiver* of the objection." (emphasis added).

[52] *Davis,* 79 M.J. at 331 (citation modified).

[53] *See United States v. Schmidt*, 82 M.J. 68, 73 (C.A.A.F. 2022) (holding that despite *Davis*, "trial defense counsel's failure to object was not waiver given the unsettled nature of the law at the time of Appellant's court-martial.").

[54] To the extent that the waiver-ignoring authority recognized in *United States v. Chin*, 75 M.J. 220 (C.A.A.F. 2016) survived the amendments to Article 66, UCMJ, by the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(b)(1)(A), 134 Stat. 3388, 3611 (2021)—which appears to be the case in the sentencing context only—we do not invoke it.

[55] Appellant's Brief at 47, 49.

a mens rea instruction. Nevertheless, we found an "*inten-
tional* relinquishment or abandonment of a *known* right" where
the appellant twice affirmatively declined to object to the pro-
posed findings instructions. Here, however, it is evident that Ap-
pellant pondered the possibility of requesting a mistake of fact
as to consent instruction, but ultimately made no such request.[56]

*Davis* remained intact then, and it endures now.[57] Appellant also argues
that we should sidestep *Davis* since "[i]t conflicts with the plain language of
the [R.C.M.s and] flies in the face of the joint trial script . . . ."[58] As the argu-
ment goes, the combination of the *Military Judges' Benchbook,* which specifi-
cally prompts the military judge to inquire about objections to instructions and
requests for additional instructions,[59] and *Davis,* which holds that negative re-
sponses to those scripted queries constitutes waiver, swallows R.C.M. 920(f)
and 1005(f)'s forfeiture provisions. However, the import of the *Benchbook* was
not lost on the CAAF when it decided *Davis:*

> The Court's decision has important consequences for counsel in
> all future trials before members. In this case, the military judge
> informed counsel of the instructions that he intended to give.
> Then, in accord with the script in the Military Judges' Bench-
> book, the military judge asked both parties whether they had
> any objections to the instructions. Both counsel answered in the
> negative. The Court holds that their answers waived (and not
> merely forfeited) any objection to the instructions and that this
> waiver prevents any review of the instructions. Counsel in fu-

---

[56] 79 M.J. 472, 477 (C.A.A.F. 2020) (citations omitted).

[57] The CAAF continues to follow *Davis*'s precedent as evidenced in a more recent
opinion:

> To the extent Appellant now complains about the adequacy of the mil-
> itary judge's limiting instruction, we note that trial defense counsel ex-
> pressed no similar concerns during the court-martial. Rather, the de-
> fense acquiesced in the language of the instruction when it was pro-
> posed and given. Therefore, this issue has been waived on appeal. *See
> United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

*United States v. Wilson*, 84 M.J. 383, 396 n.10 (C.A.A.F. 2024).

[58] Appellant's Brief at 47–48.

[59] *See Benchbook*, paras. 2-5-20 ("MJ: Counsel, I intend to give the standard sen-
tencing instructions. Do counsel have any requests for any special instructions?"); 2-5-
25 ("MJ: Do counsel object to the instructions as given or request other instructions?").

ture cases therefore must be especially careful to raise any objections that they might have to proposed instructions when the military judge asks them—as military judges do in almost every case before members—whether they have any objections.[60]

An express invitation to object at trial is a good thing. So is the efficiency to the justice system that flows from recognizing the effect of an affirmative declination to that invitation.[61] These are not incompatible.

### D. Trial defense counsel did not provide ineffective assistance by failing to request the "did you know" instruction.

"[T]he [Sixth Amendment] right to counsel is the right to the effective assistance of counsel."[62] "Allegations of ineffective assistance of counsel are reviewed de novo."[63] Pursuant to *Strickland v. Washington*, to prevail on a claim of ineffective assistance of counsel, an appellant must first "show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[64] The appellant "must show that counsel's representation fell below an objective standard of reasonableness."[65] "Judicial scrutiny of counsel's performance must be highly deferential[,]" and we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."[66] Second, an appellant "must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[67] An appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[60] *Davis*, 79 M.J. at 332 (Maggs, J., concurring) (footnote omitted).

[61] *See generally United States v. Nelson*, 82 M.J. 336, 339 (C.A.A.F. 2022) (Ohlson, C.J., concurring) ("The purpose of the waiver doctrine is 'to promote the efficiency of the entire justice system by requiring the parties to advance their claims at trial, where the underlying facts can best be determined.'" (quoting *United States v. King*, 58 M.J. 110, 114 (C.A.A.F. 2003)).

[62] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann* v. *Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[63] *United States v. Palik*, 84 M.J. 284, 288 (C.A.A.F. 2024) (citing *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007)).

[64] *Strickland*, 466 U.S. at 687.

[65] *Id.* at 688.

[66] *Id.* at 689.

[67] *Id.* at 687.

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[68] And relevant here:

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.[69]

Appellant argues that "there was no strategic reason or potential benefit to not requesting the instruction regarding 'have you heard' questions to impeach opinion testimony[,]" since "[t]hat instruction was directly on point."[70] We do not take that as given. Defense counsel may have reasonably thought it better to avoid drawing the members' attention back to that matter, fleeting as it was.[71] However, we need not speculate or order defense counsel to explain themselves, since:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.[72]

We are convinced that even had the instruction been requested and given, the result of the proceeding would not have been different. In particular, there is no reasonable probability that the members, armed with the evidence admitted during findings and sentencing and the military judge's instruction that "the accused is to be sentenced only for the offense of which he has been found

---

[68] *Id.* at 694.

[69] *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

[70] Appellant's Brief at 52–53.

[71] *See generally United States v. Wray*, 9 M.J. 361, 362-63 (C.M.A. 1980) (perceiving a rational basis for defense counsel's request that an instruction on uncharged misconduct not be given: "We don't want it. The defense feels that it would merely draw attention to what has been said.").

[72] *Strickland*, 466 U.S. at 697.

guilty,"[73] would have adjudged a lesser sentence if also given the "did you know" instruction.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[74]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[73] R. at 719–20.

[74] Articles 59 & 66, UCMJ.